Okay, the court is prepared to hear argument in the second case here, Askew v. HRFC. We'll hear from the appellate counsel. Good morning, Your Honors. And may it please the court, my name is Corey Zeidel, and I'm here on behalf of Appellant Dante Askew. We're pleased and honored that you chose this case for a hearing. This litigation arose from a motor vehicle transaction in which the appellee, HRFC, LLC, disclosed, charged, and collected interest at a rate of 26.99% for more than two years from my client, Mr. Askew, even though the applicable Maryland law caps at a statutory rate of 24%. After two years of charging and collecting the usurious interest, HRFC mailed a letter to Askew, which is in the record as JA-102, attempting to cure the violations under Maryland law, Maryland Credit Granters Closed-End Credit Provisions Commercial Law 12-10. So you sent the letter, gave them $800 for the problem that they discovered, and tried to follow the statute, and you say that's not enough. That's correct, Your Honor. In the letter, what they notify Mr. Askew of is that there was an incorrect interest rate applied to the account. They give him the $845.50 back onto the account, which recalculates interest from 26.99% to 23.99%. We've got facts. Tell us the specific problems you're going to articulate on argument. What do you think, really? We've got your brief, of course. It's all there. But tell us the specific problem that we have here that you say your client is entitled to relief from, even though this so-called attempt to try to cure was made. Well, Your Honor, we want to focus on three issues. We believe that the cure was too late, that the cure did not provide the relief necessary under the statute, and that the notice provided in the cure letter was not specific enough. So as to timeliness, the specific language in the statute is that a credit grantor can cure within 60 days after discovering an error. And that language, discovering an error, is used, was used by the Maryland Court of Appeals in the Mattingly case at a time at which the language for accrual of a cause of action was based on accrue. Has it ever been implied in any case in Maryland outside of the statute of limitations context? The use of the word discovery, the only time in appellate decisions in Maryland, there haven't been any cases defining the word discover outside of a statute of limitation. But this cure provision I wonder why that is so. I mean, you would think that might pop up somewhere. I mean, it seems to be some reason as to why discovery applies in a statute of limitation context but not in a statute that opposes a different type of case. It kind of has to do with who is the wrongdoer in the case. I understand the question, Your Honor. Although this is not strictly a statute of limitation because the statute of limitation would apply to Askew's case affirmatively against the credit grantor, this is worded as a limitation period, a limitation on time for the credit grantor to act. And it's worded identically to the way statute of limitations and statute of repose are worded in the Code of Maryland. So in Maryland, there's three different ways that a statute will be worded. It will either be three years from the date of this specific action, three years from the date of accrual, or three years from the date of accrual or, at a maximum, 20 years from the date of the action. And this is identical to that last type of statute of limitation. It provides an absolute bar date, which in 12-1020 would be actual expressed knowledge of the violation. But earlier in that same provision, it provides the original bar date. Whichever one comes first is the bar date for this cure, and the original bar date is discovery of an error. So within CLEC, there's numerous instances where the General Assembly is differentiating between actual expressed knowledge and implied actual knowledge. Within the statute itself, in 12-20, there's language about actual expressed knowledge. Notice from the buyer, notice from the consumer, that's actual expressed knowledge. Notice is defined under 12-1018 as actual expressed knowledge. 12-1013.2 uses the words actual knowledge as the amount of signature that a credit grantor has to have as the assignee in order to be liable under this statute. Mr. Fiedle, I appreciate that argument, but it seems to me that the discovery rule in the context of an affirmative claim of a plaintiff, there's a different policy objective there. The objective is to prevent the presentation of stale claims by imposing an obligation on a plaintiff to take some reasonable steps to discover a claim when he or she can do so. The objective here is different. It's intended as a safety valve to allow a creditor to fix a mistake. And it seems to me that if we apply your construction of this statute, that we are providing a huge disincentive for creditors to come forward after the 60-day period, I mean, they're likely to take their chances. The consumer is likely never to figure it out. Your client never figured it out. So that doesn't seem to make much sense to me in this context. Well, Your Honor, and I understand your question. When this statute was originally enacted, correct, there was no 12-1020. There was no cure under, and that's the pre-actual express knowledge cure. There was no post-actual express knowledge cure under 12-1018. That was amended into the statute to be consistent with other credit lending provisions in the State of Maryland to provide lenders this cure. So when this was originally enacted, there was no basis to cure at all. This was enacted to provide a basis to allow a lender to cure, a credit grader to cure under this statute under specific instances. But what happened here is related to the interest rate charged on the loan. So when we're talking about the policy of allowing a lender to fix things, I think we need to talk about the policy of requiring a credit grantor to read the laws of the State in which they're acting under and to read the contracts to which they are entering into. And I wanted to quote Judge Davis in DeCohen v. Capital One, which Judge Wynn was also on the panel. Capital One made an argument that under CLEC it was going to be very burdensome for Capital One to have to read all these State laws and become familiar with all these contracts. And the court said, quote, we have little sympathy over this lament. Examining State laws for usury limits and contract provisions is exactly what banks already do. And it seems to me that's exactly what the holder here did. Aware of State law, it examined the papers, discovered the error, which, as Judge Diaz said, your client didn't discover, almost certainly would never have discovered. And now you want to punish, in quotes, punish the holder for its diligence. Under your theory, if I understand your theory, any subsequent holder who takes the paper more than 60 days after the deal is closed, that's strict liability. That's absolute liability, right? Sixty days from the time that the original holder, let's say it would be assigned to HRFC. They, in this particular type of violation, this interest rate violation, I would agree, my argument here today is that that would be 60 days from the date that they received that note. Yes. Then there's no way they can cure it. They can cure it within the first 60 days.  No, Your Honor. They have no incentive to do anything other than do as Judge Diaz said. Why in the world, if you know you can't cure it and you're going to be punished, just keep charging 26.99%. Your client was paying it. Well, to some extent, he was paying it or carrying through with it, and probably would have never come up. But this lender tried to follow it, and it looks like, you know, tried to do what was right and moved it down to the lower interest and gave him back the difference on it. Why wouldn't we encourage that to happen? Well, in this instance, the facts are a little off. HRFC did not find the error. A third party unrelated to HRFC notified HRFC that there was something wrong with the interest rates they were charging. I don't know who it is because they held an attorney-client privilege related to it, but it's not HRFC that went and looked at its own contracts. That doesn't matter. The fact of the matter is your client didn't get it. He wasn't the one that knew anything about it. And these kind of loans are sort of targeted for people. I mean, as bad as it sounds, 24.5% or 26%, the 24% loans, they can't get a loan from anybody. And that's the – I mean, there's a service here, even as bad as that sounds, like it's a horrible interest rate, he can't get a loan from anybody, so they're giving him a loan. But it's, you know, the loan that's allowed. They discovered it's about 2% more than what it should be, and now they want to correct it and make it like it's supposed to be. But a client in your position, for more than likely, as Judge Diaz pointed out, probably would have never discovered this. I mean, I wouldn't have known it if you don't sit here and read this and know what's going on here. Obviously, that same contract that you say HRFC didn't read, he didn't read either in terms of what was there. And he didn't know the law until he gets to a point where I find it really interesting. He gets to the point he's about to lose a car. He then finds a lawyer. And I won't go into how he pays you to pay for his car, but we – but it's – I don't get this first point that well. And maybe we can rest in terms of let this kind of massage you a little bit, and you go to the second point, which you might be to bite us a little bit more. But I think the first point we probably own the fence pretty strong. Sure, Your Honor. I just – I would say that to the point that you say if the lender doesn't correct it before, then they never have a right to correct it after, that 12-1018 still gives them the right. If they were acting in good faith, even after the claim is brought, they still have 10 days to cure it. So they still have that post-actual express knowledge cure ability. So with that, I'll move on to what – why the cure wasn't sufficient. $845.40 wasn't enough reimbursement to cure because under Maryland law, under every Maryland lending law, including when there's no Maryland lending law in place, the legal rate of interest is the maximum amount of interest that can be charged if there's no written agreement that is confined within a statutory provision. So the constitutional rate is 6%. You can always – a creditor can always charge up to 6% and not be in violation of the law, even if it's not in writing. But once it's over 6%, any contract in the state of Maryland lending money has to abide by statutory provisions in order to charge more than that. So under CLEC, 12-1002, that provides the basis for imposing interest under CLEC. 12-1003 provides how much interest can be charged. And in that provision it says a credit grantor may charge the amount permitted by the statute up to 24% if they agree to an amount equal to or less than 24%. Well, that's not what happened here. They agreed to an amount that was greater than 24%, 26.99%. So under this CURE provision that requires that the correction of the error, the correction would have needed to be providing the interest paid by Mr. Askew from 26.99% to at a very minimum down to 6%, the constitutional rate, because there was never an agreement here to collect interest within that statutory amount. And this has been determined by the Court of Appeals, United Cable Television v. Birch. And in that case, the Court of Appeals stated parties, and this was related to late fees, to which no statutory provision applied. The late fees turned out to be more than 6% on an annual basis. And the Maryland Court of Appeals said parties may contract for any rate within a statutory statute fixing the interest limits. And you made this argument below and you made it here. You made this argument. This argument is what you're giving us right now is the argument you made below. Your Honor, below, we argued that the amount that was provided back to Mr. Askew was not sufficient. But you argued below that there was no agreement to the parties, and therefore, since there's no agreement, they're entitled to the 6%. Well, in the district court, we argued that the refund should have been 0%, and that's what we argue in this as well, that the refund should have been from 26.99% to 0%. And then if they would have disclosed an interest rate 24% or below, then they would have had the ability to begin collecting interest at that rate, which was not done. On the appellate brief here, we also inserted that as a backdrop, 6%, even 6%, and I put that in the brief so that the Court would understand. Even at 6%, there would be an argument that that would have been acceptable. But to lower it to 24%, I'm sorry, 23.99%, without an agreement between the parties in writing, that's not acceptable. I see that my time is up, and I did reserve some time. All right, thank you. We'll hear from the appellee. May it please the Court. Kelly Lippincott on behalf of HRFC, LLC, doing business as Hampton Roads Finance Company. If the Court were to accept the interpretation that Mr. Eskew makes of the statutory scheme in Maryland under the credit grant or closed-end credit provision, it would essentially invalidate and render completely inaccurate and ineffective two very important safe harbor provisions that are provided for credit grantors. The first safe harbor provision is set forth in 12-1018A3, and that allows a credit grant. Both of them would be good within the 60 days. Sorry? Within 60 days, you could use those provisions. Correct, Your Honor. You don't invalidate it for the first 60 days. You only got 60 days after you discover, and I guess the statute does have that word discover in it. It has the word discover in it, but when the Court looks at 12-1020, particularly along with 12-1018, the other important safe harbor provision, in 12-1018A3, it allows a credit grantor who doesn't discover a mistake on his own, does not correct a mistake on its own, but instead doesn't realize or receive notice, as the word is used in 12-1018, does not receive notice. Notice is defined specifically in the statute as either being served with a lawsuit by the borrower, receiving written notice from the borrower, or by receiving written notice from the Commissioner of Financial Regulation. Under that situation, where a credit grantor hasn't bothered to look back at their credit contracts, has not found out, discovered the error on their own, under that situation, the credit grantor still has 10 days to fix the error, even after they've already been sued or filed, served with a complaint by the borrower. In our case, we fall within 12-1020, which is the other important safe harbor provision. And that is for a credit grantor who realizes the error on its own, comes to discover the error on its own, not through notice as defined in the statute, written notice from the Commissioner, the borrower, or being served with a lawsuit, but discovers the matter on their own and then promptly corrects it, promptly corrects it within 60 days. And that's exactly what HRS is using. Discover the error, because the law was what it was when they charged the interest rate, and I guess the law mandates that you ought to know what you're charging. You charge one that's in excess of the useless rate, in this instance, the 26.99%. I mean, what's there to discover? I don't know if it's discover or at least it educated itself to what it ought to have known is probably a better way of putting it. I got the term discover, but I don't know. It's like you're breaking a house and then you discover that's illegal. Maybe I'm oversimplifying it, but I don't think that's the right word to use, even though the statute kind of uses the discoverer word. And, Your Honor, just to use your example, I think that is an oversimplification of it. There isn't a situation where it's appropriate to commit a burglary. There isn't a situation where it's proper to commit a crime such as that. That's not what we're dealing with here. We're dealing with a statutory provision that sets forth a specific maximum interest rate that is allowable, but that is not the only interest rate that's allowable under the law, and that was part of the reason for us pointing out the other statutory provision that could govern a sale of a vehicle like this one, which is the Retail Installment Sales Contract Act, and that allows for an interest rate up to 27 percent. So there are situations where a credit grantor could charge 26.99 percent for an auto loan. That is not illegal. Contrary to Your Honor's example of breaking into a house, I can't think of a situation where that is legal or permissible, but there are situations where charging 26.99 percent on an auto loan is allowed under the law. So why wasn't he entitled to an opportunity to come in and say, okay, I'll pay 21 percent, but I don't want to pay 24 percent? Just because he agreed to pay 26.99 doesn't mean two years later necessarily he's willing to agree to pay 24. Or to think of it differently, he agreed to pay the highest allowable interest rate that's permitted under the law. But things change over time. So maybe two years later he wants to come in and say, well, you know what, I'm not going to pay more than 21 percent. I would like to do the same thing with all loans that I currently hold, Your Honor, as well, negotiate down a lower interest rate. But that is not what myself and my credit grantor bargained for. What does Maryland law say about your client's ability to just substitute the highest available rate? What do we know about that? It does not speak to that directly, Your Honor. It doesn't speak to that at all? No, it does not. Do you certify that question to the Maryland Court of Appeals? Your Honor, Mr. Seidel already asked this court to certify some issues to the Maryland Court of Appeals, but that request has been denied. But I'm asking it now. I don't think that it needs to be certified, Your Honor. And the reason why is because we are falling within the safe harbor provision of 12-1020. And the requirement for a credit grantor to be absolved of liability under that statute is to correct the error. And the error that we made was in charging him an interest rate greater than 24 percent. We promptly corrected that within 60 days of discovering the error. And I guess the argument on the side, to paraphrase the argument on the other side, is that you charged an illegal interest rate. Right? I mean, that's just another way to characterize it. In violation. So the question is, under Maryland law, what remedial scheme, to what remedial scheme or idea should we look in determining, you know, do you get away with just sending the check for 860? Well, actually, you didn't send him a check. You credited. Credited his account. And we sent him a letter explaining to him that the interest rate charged was incorrect. Now, as Mr. Zeidel argued, I guess we would have to send him a new agreement, get him to enter into a new agreement with us for 23.99 percent, have him sign it, and then we could start charging him the new interest rate. We had an obligation separate and apart from that. We had to correct that with or without his agreement. We could not continue to charge him 26.99 percent. We were aware of this error. We needed to correct it within 60 days, and we did so. Did you send him a new payment book and all that? I mean, I don't know if payment books are used. I'm sorry, Your Honor. I don't remember if there was even a payment book issued here. If his monthly payment was X and then two years later you reduced the interest rate, you credit back, does the monthly payment change? The monthly payment from Mr. Eskew did not change. It did not change. It did not change, but in our letter to him. How could it not change? Well, at JA 102, as we explained to him in the second paragraph of that letter, as a result of this adjustment, you will repay the contract earlier than originally scheduled if you continue to make your scheduled monthly payments. If you would like us to adjust your monthly payments so that the contract will be repaid on the date originally scheduled, please let us know. So you could have reduced his monthly payment? We could end up charging him more interest in the long time of the loan if we would have kept the contract. Well, but you could have reduced his monthly payment. Potentially, yes. It could have reduced his monthly payment. Absolutely. Which might have precluded a default. I mean, people, as Judge Wynn said, these are people who are under severe financial pressures, obviously, and a modest reduction in monthly payment could actually be a significant benefit to people in this cohort. And if Mr. Eskew felt that that would have benefited him, he could have certainly asked for that. We give him this option to do it the other way, as your Honor suggests. Repeat what you said again? Certainly. As a result of this adjustment, you will repay the contract earlier than originally scheduled if you continue to make your scheduled monthly payments. If you would like us to adjust your monthly payments so that the contract will be repaid on the date originally scheduled, please let us know. No, let's just spend it out for the time period that it's supposed to be, as opposed to shorten it, then it would be less per month. Right. I wouldn't call that lawyer gibberish, but I'm not sure the average layperson is able to process that the way that you and I obviously know exactly what it means, as Judge Wynn just said. I don't know. Well, I think it clearly explains to him that he's going to pay it off sooner, and that if he wants more time to pay it off, he can do so. It would have been better, wouldn't it, to have said, you have this option. We can reduce your monthly payment by this amount, or you can pay this loan off six months earlier, or whatever it was. I think that is a personal choice, depending upon the borrower. I think you could pose that same option to multiple borrowers. No, I was articulating how it might just hypothetically have been a better way to say it to a layperson. I don't know if I agree, Your Honor. Fair enough. I think we gave Mr. Askew ample information, invited him to contact us if he had any questions, and he simply chose not to. I think you need only focus on the statute, the provision here that provides for the notification. What it provides for is that at that point, the creditor will then make whatever adjustments are necessary to correct the error. It doesn't say anything about renegotiating and that sort of thing. Exactly. And the United case dealt with moving it to six percent because the Maryland Constitution sets that at the legal rate, I think. And there's no statute in that case that allowed for this. But the Constitution does make that exception and say if the General Assembly permits it. Here the General Assembly has permitted this upward amount here, which seems to me that in the adjustment of it, you'd move it down to what the General Assembly has permitted. Just like the Constitution says six percent, if you didn't want to do six, you could go to three or two. But because the General Assembly has raised the bar, at least in these kinds of loans, that seems to me to be the reason your client decided to use the highest legally permitted rate, which under the Constitution would be six percent, but because the General Assembly had moved it to 23.99, it's there. So, you know, that's a lot of going back and forth, but that seems to be a pretty straightforward point on that. I agree with that, Your Honor. Also, when we adjusted the account for Mr. Eskew, we changed it back. We credited back to the time so that he would have full benefit of the correction and so that there wasn't any further interest accrued on this new rate. Did you pay him interest on the interest? We paid him interest on the interest. I don't believe interest was paid on the interest, Your Honor. That would have been appropriate, right? No, I don't think that it would have been. If his contract called for him to pay $100 a month per payment at 26.9 or whatever it was, and then two years later you discovered that all of those 24 payments were overpayments because the interest rate should have been less and therefore the monthly payment should have been less, you had to value the time value of his funds, right? And arguably he should have gotten interest on the amount of the overpayment, as you calculated. That amount then essentially went to the principal because then it was not being taken up as interest payments. It was being applied then. It would have affected the principal on the loan. But you didn't apply it to the principal. You just said you didn't pay interest on the interest. I don't quite understand your understanding. He overpaid. His payments were, he made overpayments. Correct. He had made overpayments. And so you credited back the amount of the overpayments. Over $800. Right. But in the meantime, each month you had the use of his, whatever it was, $1.50, whatever the marginal increase in interest payments were, you had use of that money, but you weren't entitled to it. So 24 months later when you were crediting back, I'm suggesting maybe you should have credited back not just the overpayments of interest, but the monthly accruals of interest on the amounts of the overpayment. And, Your Honor, I'm not aware. I was not a math major. And neither was I. Or a finance major. Neither was I, Your Honor. I don't know how the $800 figure came about. Do you know that that's included? Yes. We submitted an accounting sheet that is attached as an exhibit to our motion for summary judgment that is contained in the record extract. So that is clearly articulated and explained in probably more detail than I'm capable of explaining, Your Honor. Yeah, that may be, that's an interesting question. But given interest rates, I don't know that it amounts to much, if anything, market rate of interest. That's true. And I'm not aware of any requirement under the statute to do is what Judge Needham is suggesting. Let me ask you this. Judge Winn gave you the example of someone understanding that breaking into someone's home is obviously a crime. And that gets to this maxim about ignorance of the law being no excuse. Now, granted, this is a different scheme. It's a little bit more sophisticated, a credit scheme. But why isn't ignorance of the law applicable in this case? Your client certainly knew or should have known what the statute said. So why shouldn't we hold to it, notwithstanding the safe harbor provision? Well, because that's not what is set forth in 12-1020. And the corollary safe harbor provision in 12-1018, that requires a credit grantor to show that it was unintentional and in good faith. There is no similar requirement under the safe harbor provision set forth in 12-1020. So in your view, if your client had intentionally imposed this interest rate, not as a result of a mistake but said, eh, he's never going to figure this out, we're just going to whack him with this interest rate for as long as we can, what happens in that scenario? Is he still entitled to the safe harbor? In that scenario, if there was a willful decision, I think I would have some problem under 12-1020 anyway because then that would go to when did I discover it, when did I know. And if I was willfully looking at this borrower and saying, ah, I'm going to charge him more than the statute allows and I'm going to see how long he can get away with it, that is something I think that evidence could be presented to show that I had that nefarious intent and I knew full well that I was intentionally charging him an impermissibly high interest rate. I think in that situation of such a nefarious credit grantor, I think that credit grantor would have some challenges with 12-1020 and being able to take advantage of its safe harbor provision. But there is no such evidence here. You want to address the appellant's position that your client is entitled to no interest because of the failure to state the correct interest rate on the contract?  Thank you, Your Honor. The two sentences in 12-1003A, the first one addresses what is the maximum allowable interest rate and then the other one addresses a disclosure requirement. The second sentence states, the rate of interest chargeable on a loan must be expressed in the agreement as a simple interest rate or rates. We told him exactly what we were charging him. It was 26.99%. That is clearly set forth on the retail installment of sales contract. Your point is that's a simple interest even though it's not the right one. Exactly, Your Honor. It wasn't the right one. We disclosed it. Now, I could not stand up here before this court and say that we only had one violation of 12-1003 because we put on the retail installment sales contract 23.99% but we're actually charging him 26.99%. That would be two violations. This is not two violations. We violated the charging the maximum allowable interest, regrettably, but we did not violate the disclosure requirement. Would the court like me to address the breach of contract claim or the Maryland consumer? I think we're satisfied unless you want to further the question. I don't have anything further than what's beyond what's set forth in our briefing. Thank you. We'll hear a loud rebuttal by the appellate. Thank you, Your Honors. I want to start off by addressing Judge Davis' point about interest on interest. We argued in our brief in the breach of contract section that even if there's this cure, even if the court decides that the cure is appropriate, timely, and adequate, Mr. Askew is still entitled to interest on interest. How much would that be? It would be prejudgment interest, which is 6% in Maryland State Court. He would be entitled to 6% on the amount? On the amount that was collected. I probably would argue he's entitled to 26.99% since they did it in the early one. But if it's 6%, how much are we talking about on $800? Right. How much money are you talking about? What's the remedy you're seeking on the interest on interest? How much? Of the $845. If that was the correct amount, then the 6% would be in the range of $200. So you're not over here with $200. I know that this is not going to be what you're going to use rebuttal over $200. Well, Your Honor, it's a larger case than an individual case. I understand that. It's not a class action. I understand that. I'm not belittling it. I'm just saying I know that's not going to be what you're going to spend rebuttal on, is on interest on interest of $200. Okay, Your Honor. Is it? I just wanted to address the point. I got you. That it's inadequate in that way. As to substituting the highest rate, sua sponte, without further agreement, the statute itself, it states a condition preceding prior to charging interest. It only allows interest. Ms. Lippincott in the district court, they've read the statute to say that the first sentence says what kind of interest you could charge. The second sentence of 12-1003 says how you have to disclose what interest rate you're charging. But that's not how I read the statute, and that's not how I believe the Maryland General Assembly believed the disclosure was required, because what benefit does an illegal disclosure provide to anyone? The first sentence is a condition preceding to charging interest. It says you are permitted to charge an amount of interest if the parties agree to a legal amount, 24% or less, and that amount's contained in the agreement. It says specifically as the agreement provides. There's nothing in the agreement that provides a legal rate of interest. The second sentence then goes on to say the rate of interest chargeable on a loan must be expressed in the agreement as a simple interest rate. But the word chargeable is referring to the first sentence. A chargeable amount is a legal amount. It's not any amount that you say you can't put 1,000% in the contract and then charge 24%. The consumer has no idea what you're doing. You know, it seems to me that argument certainly would have more appeal to me if the charge 20%, they come back and say, no, we want to now charge 23.99%. It says, no, we don't have an agreement, 23.99%. But according to the contract, at least the attempt was made to agree to 26.99%, which definitely the lower interest rate is in that amount. But you say because it's illegal, you can't do it. You can't even walk off with the car on it, so there's no agreement. Right, there's no contract at all. If there's no contract at all, then you're going to have to rely upon these consumer provisions to keep your client from owing for the use of this car during a time period when he didn't even make an agreement with it. No, Your Honor. The Maryland law would still allow HRFC to charge 6% interest on the loan under Maryland's constitutional provision. Well, that's because in that case, there was no statute that allowed the General Assembly. There was no statute that said what interest rate would be higher. Here there's a statute that the General Assembly says you can charge up to the higher amount. Right, assuming that you follow the provisions of the statute. But in any event, the statute allows you to do it in this type of case. United, they didn't. The reason we had to go to 6%, there's no statute. There's no statute that the General Assembly has. The Constitution makes that exception. If the General Assembly says you can charge a higher interest rate, you can do it. If it doesn't, then you've got to charge 6%. Correct, Your Honor. Here it authorized 23.99%. Well, I think we're agreeing on that premise, but where we're disagreeing is what happens when you don't agree to make the interest rate payment within that limit. So 24%, if the agreement would have said 24%, everything would have been satisfied. The condition proceeding that there's an agreement on the rate, that it's in the contract, that it's 24% or lower. It's all there. I think we agree on that point right now. I think you're right. We disagree on what happens if you don't do it. Right. And so I'd just ask, Your Honor, to go, if Your Honor feels the need, to go back and read the Birch case again where the Court specifically refers to, although that case did not involve a statute, the holding refers to even if there is a statute involved, if the amount's not within that statutory limit, then you go back to the legal rate. And they're not referring to the legal rate of the statute. They're referring to Maryland's constitutional legal rate, which is 6%. I thought your initial position was that they're not entitled to collect any interest. Now you're saying that they're at least entitled to collect 6% interest? It's an argument to say that the amount that was refunded wasn't sufficient. It is still the belief that 0% would be the amount, because there's no fallback within the statute that says you can get back to the legal rate. But the Birch opinion does say that there's a constitutional legal amount of interest, even if you're not within a statutory provision. So, yes, the argument stems from whether or not the appropriate amount of money was refunded to correct the error. And the argument is that it should be zero, but at a baseline, in ASCQ's worst-case scenario, the loan should have been restated to 6% up until that time. All right. Thank you very much for your argument. Thank you, Your Honor. All right. We'll come down and greet counsel and proceed to the next case.
judges: James A. Wynn, Jr., Albert Diaz, Andre M. Davis